## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DOUGLAS R. PERRY,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **2:15-cv-00173-KOB** |
| **HAGEMEYER NORTH AMERICA,** ] | |
| **INC.,** ] | |
| ] | |
| **Defendant.** ] | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Douglas R. Perry claims that his employer discriminated against him on the basis of his age in violation of the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and its Alabama counterpart, ALA. CODE § 25-1-20 et seq. This matter is before the court on Defendant's Motion for Summary Judgment (doc. 25) and accompanying Memorandum of Law. (Doc. 26). Plaintiff filed a response (doc. 31), and Defendant filed a reply. (Doc. 33).

For the reasons stated in this Memorandum Opinion, the court will **GRANT** Defendant's Motion for Summary Judgment.

## I.      Standard of Review

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the

1

moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden shifts to the non-moving party to produce sufficient favorable evidence "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

When ruling on a motion for summary judgment, the court should view all evidence and inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks and citations omitted).  This standard exists because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)

2

(quoting *Anderson*, 477 U.S. at 255).

After both parties have addressed the motion for summary judgment, the court must grant

the motion only if no genuine issues of material fact exist and if the moving party is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56.

## II.   Statement of Facts

Plaintiff Douglas R. "Randy" Perry was born in 1956. Mr. Perry worked for Defendant

Hagemeyer's corporate predecessor, Vallen Safety Supply, from 1983 until Hagemeyer

purchased Vallen between 1999 and 2001. Mr. Perry then worked for Hagemeyer until his

termination on April 1, 2013, when he was 56 years old. While working for Vallen, Mr. Perry

held the position of sales office supervisor for approximately three years and then became branch

operations supervisor for approximately ten years. Mr. Perry was made an outside sales/account

representative after Hagemeyer purchased Vallen and held that role until his termination.

Throughout his entire employment, Mr. Perry was based in Birmingham, at his employer's

Pelham, Alabama branch.

Hagemeyer is a business-to-business distributor of industrial, safety, and electrical

services and products to customers in the utilities, heavy equipment manufacturing,

transportation services, and metal industries. Hagemeyer provides to its customers a range of

procurement and inventory management services, including automated vendor-managed

inventory (VMI) systems, customized on-site storeroom management, and integrated supply

specialists. As an account representative, Mr. Perry's primary responsibilities included selling

and servicing VMI services; maintenance, repair and operations (MRO) products; and electrical

products to industrial customers in the Birmingham territory. From 2001 until his termination,

Mr. Perry's direct supervisor was Jay Hooten, the District Manager of the Memphis/Alabama District.

      A.     U.S. Steel Account

Soon after he became an account representative, Mr. Perry was assigned to Hagemeyer's U.S. Steel account. In 2005, Hagemeyer obtained an on-site service contract with U.S. Steel at its Fairfield, Alabama mill, under which Hagemeyer conducted drug testing and other safety activities for U.S. Steel contractors. Mr. Perry was the primary account representative for the Fairfield mill and so benefitted from the contract in the form of increased commissions, although other employees actually managed Hagemeyer's daily operations at the mill. Originally, Hagemeyer contracted with U.S. Steel to provide various kinds of safety equipment at its Fairfield mill; as account representative, Mr. Perry added other products and services to the contract and played a large role in building up the U.S. Steel account.

The U.S. Steel account comprised a significant portion of Mr. Perry's sales. For example, in 2003, U.S. steel sales accounted for approximately half of Mr. Perry's annual sales of $2.5 million. In 2005, sales to U.S. Steel made up almost $2.5 million of Mr. Perry's $3.2 million in total territory sales and boosted his gross margin percentage from 26.74% in 2004 to 30.36% in 2005. These numbers remained similarly high through 2008, when U.S. Steel sales accounted for roughly 89% of Mr. Perry's total annual sales.

In late 2008, Hagemeyer learned of the risk of losing the Fairfield mill contract. Effective June 1, 2009, Hagemeyer designated the U.S. Steel account a "house account," which meant that neither Mr. Perry nor any other account representative received commission credit for U.S. Steel sales from that point forward. Mr. Hooten stated in his declaration that the account was taken

4

from Mr. Perry to encourage him to focus on generating new business and new customers. Mr. Perry contends that Mr. Hooten did not communicate this purpose to him until the next year and that, at various times, he was told this change was made to save jobs and because Mr. Perry "was the only one making any money" while Mr. Hooten and another employee were not going to receive bonuses that year. (Doc. 27-2 at 77:8). Mr. Hooten denies that he ever told Mr. Perry the change was made to save jobs or to increase bonuses.

Hagemeyer reduced Mr. Perry's salary upon designation of the U.S. Steel account as a house account. In June 2009, Mr. Perry was 52 years old and was the second-oldest account representative Mr. Hooten supervised. By late 2009, Hagemeyer had lost the Fairfield service contract, resulting in a sharp decline in U.S. Steel sales numbers.

B.    Job Performance Prior to Loss of the U.S. Steel Account

Mr. Perry received praise and recognition for his job performance before and after he became an account representative. In 2008, he received an award from Hagemeyer "for [his] outstanding sales performance in 2008"; he had received the same or a similar sales award prior to 2008. (Doc. 32-1 at 54). Mr. Hooten commented in Mr. Perry's 2008 performance evaluation that Mr. Perry had "a tremendous year" and that "[h]is sales number alone is impressive, but coupled with the GM% it is awesome! Randy also capitalized on an opportunity with Alabama Power . . . . Their sales were unplanned and help [sic] push Randy over the top of his budget. . . . GREAT YEAR !!" (Doc. 32-1 at 57).

Mr. Perry became Hagemeyer's leading Alabama account executive several years prior to 2008 and held that spot until Hagemeyer made the U.S. Steel account a house account in 2009. Prior to the designation of the U.S. Steel account as a house account, Mr. Perry gave a number of

his accounts to other account executives upon the request of Mr. Hooten; he did so because "[he] still had U.S. Steel." (Doc. 27-2 at 37:15). Mr. Perry affirmed in his 2010 performance review that he "gave up over 40 accounts over the past 3 years to help jr. sales reps have some established accounts," and noted in his 2011 performance evaluation that "[a]ccounts were taken from me over the past several years." (Doc. 27-1 at 16, 20). Mr. Perry was not disciplined during his 30 years of employment.

      C.      <u>Job Performance After Loss of the U.S. Steel Account</u>

 None of Mr. Perry's other accounts were made house accounts or given to other account representatives at the time the U.S. Steel account was taken from him. Mr. Perry's account base did not decrease from 2010 through 2012. Mr. Perry's sales, as measured by his yearly gross margin, declined from 2009 through 2012. During this time, he failed to replace the U.S. Steel business and other decreasing revenue accounts with new customers. None of his quarterly gross margin numbers from 2010 through 2013 were as low as his gross margin numbers for the last two quarters of 2009.

In his 2009 performance review, after Hagemeyer took away the U.S. Steel account, Mr. Perry was rated as "Needs Improvement" (2.00–2.99 out of 5.00) in the "Customer Focus" and "GM Dollars ($) to Plan" categories and as "Unsatisfactory" (0.00–1.99 out of 5.00) in the "Value Plus Performance" category; he was rated as "Strong Performer" in "New Account Development." He received an overall performance rating of "Needs Improvement."

In his 2010 performance evaluation, Mr. Perry was rated as "Needs Improvement" in "GM Dollars ($) to Plan," "New Account Development,"and "Value Plus Performance," with an overall performance rating of "Needs Improvement." Mr. Hooten commented, "Although Randy

grew his business with APCO, he fell short of his total GM$ plan by $245k. Randy has been in the Birmingham market his entire career and has got to develop new relationships to compliment [sic] his key account. Randy must grow his territory by adding new customers." (Doc. 27-1 at 15).

In his 2011 performance review, Mr. Perry was rated as "Needs Improvement" in "Value Plus Performance" and as "Unsatisfactory" in "GM Dollars ($) to Plan" and "New Account Development," with an overall "Needs Improvement" rating. Mr. Hooten commented that Mr. Perry "needs to work harder to get more customers" and that he

> fell woefully short of his sales and GM dollar goals by $750K and $191K . . . . Plant Miller was down . . . but Randy didn't bring on any new business to replace it other than the VMI vending machines at Gaston. Randy single handily [sic] got us an opportunity to quote on Sabic's PPE contract.[1] I want Randy to create a list of target customers and start calling on them -- he is fully capable of bringing new business to the table.

(Doc. 27-1 at 19).

In 2012, Mr. Perry's sales numbers fell below his GM dollars goal for the fourth consecutive year; his 2012 goal was $450,000 and his actual total was $289,882.19. His 2012 performance evaluation included an "Unacceptable"[2] rating in "GM Dollars ($) to Plan," "MRO-Value Plus Performance; C&I- Marketing Initiatives," and "New Account Development," with an overall "Unsatisfactory" ranking. Mr. Hooten commented in this review: "Another year has passed with Randy underachieving and not growing his territory to an expected level. . . . I have

---

[1] Mr. Perry testified that Hagemeyer ultimately never submitted a bid. (Doc. 27-2 at 98:4–100:20).

[2] Presumably equivalent to "Unsatisfactory."

had numerous conversations with Randy expressing my concerns and stressing the need for him to pick up his pace, but to no avail." (Doc. 27-1 at 23).

After the U.S. Steel account was designated a house account, the most substantial account assigned to Mr. Perry was the Alabama Power account. Mr. Perry made up to three trips a week to the Alabama Power plant in Wilsonville, Alabama to complete a weekly inventory and restock vending machines. Mr. Perry told Mr. Hooten in January 2013 that he was spending so much time traveling to restock the Alabama Power vending machines that he had difficulty building up other business. Mr. Perry asked Mr. Hooten if a warehouse employee could restock the vending machines instead, but Mr. Hooten declined to designate a warehouse employee to complete that task. However, after Mr. Perry was let go, a warehouse employee took over restocking vending machines for Alabama Power. Mr. Hooten testified that he and other sales representatives regularly restocked inventory for customers.

    D.    <u>Performance Improvement Plan</u>

As a result of his failure to generate new business and improve his sales performance, on January 11, 2013, Hagemeyer placed Mr. Perry on a Performance Improvement Plan (PIP), which set out the following four requirements for Mr. Perry to complete:

> 1.    Create a specific business plan targeting 20 customers explaining how you will penetrate the account (specific products, HTS presentation, VMI, etc.) This can be for existing customers on big pieces of their business you don't have today. Your plan should include contacts and phone numbers, very specific dates you plan to meet the customer, expected revenue, and a timeline for revenue. This should be a very aggressive plan pointed towards $500,000 in GM$ per year. I expect this plan within 2 weeks.
>
> 2.    Starting immediately, you will be required to submit a call report for the upcoming week by COB each Friday. Your

3.     report will show the day, customer, contact, purpose of call, etc. for minimum of 5 calls per day. I'll provide you a 2013 Success Planner call report for you to use.

3.     Contact our key supplier reps and include them in your business plan. At a minimum, you will work with 4 different suppliers each month making joint end user calls. Also, two full days per month shall include sales calls with Ken Coats. (to start within 2 weeks)

4.     Enter customer cost savings proposal equal to 5% of monthly sales in the VPP database. Proposals do not have to be approved to count, but they must be entered each month.

(Doc. 27-1 at 27).

The PIP required "improved and sustained performance, in addition to meeting specific sales goals and HNA Account Representative Requirements." (*Id.*). Mr. Hooten, when he presented the PIP to Mr. Perry, emphasized that Mr. Perry must meet each of the requirements: "We want you to work. I don't want to let you go. But I'm telling you, if you want to work here you're going to follow the guidelines of this PIP, and if you miss any one of them, we're not going to have another conversation." (Doc. 27-2 at 43).

Hagemeyer claims that in response to the PIP, Mr. Perry submitted a business plan with 19 customers. *See* (Doc. 27-1 at 30). Mr. Perry maintains that the business plan listed 20 customers. He testified, "I know I would have put 20"; that he recalled specifically trying to follow Mr. Hooten's instructions "to the letter"; that he was not informed he had listed only 19 contacts; and that he "believe[d] he would have counted it before [he] sent it to [Mr. Hooten]." (Doc. 27-2 at 46:18, 88:11–15, 89:8–10). He also stated that if he had only listed 19, "I might as well have retired. I mean, I would not put 19 on there from him asking me to do 20. Why would I waste my time to do it?" (Doc. 27-2 at 88:16–19). At Mr. Hooten's deposition, before being shown the plan with 19 customers, he testified that he guessed the plan listed 20 people

9

"[p]robably to the T . . . ." (Doc. 32-2 at 275:10).

Beginning with Friday before the week of January 21, 2013 and continuing through the Friday before the week of April 1, 2013, Mr. Perry submitted a weekly call report on Fridays indicating which customers he planned on calling the following week. During that time, he called on five of the nineteen potential customers he had identified in his business plan. The call report did not reflect a plan to call at least five customers every day. Mr. Hooten did not document any inadequacy concerning Mr. Perry's business plan or call log.

Although Mr. Perry did take a supplier representative on a sales call with him on three different occasions, he did not take four different suppliers on calls with him each month. He did not inform Mr. Hooten that he had difficulty scheduling calls with supplier representatives. Mr. Perry contacted Ken Coats to set up sales calls with him, but the two were unable to agree on times and dates to make the calls. Mr. Perry did not make any sales calls with Ken Coats and did not inform Mr. Hooten that he had any difficulty scheduling calls with Mr. Coats.

Mr. Perry drafted handwritten customer cost savings proposals to enter into the VPP database, but did not enter any proposals into the database. Mr. Perry did not enter them because Mr. Hooten told him that the program was not running, and he did not provide the proposals to Mr. Hooten in any other format.

Based on his March 2013 year-to-date gross margin numbers, Mr. Perry was on track to meet the sales performance measure of the PIP, considered by Mr. Hooten to be the "most important" element of the PIP, during the period between January 11 and April 1, 2013. (Doc. 32-2 at 303:18). Mr. Hooten indicated that "one of the reasons" Hagemeyer fired Mr. Perry was because of "[t]he manner in which he was generating those sales . . . he was telling his customers

to buy from him or he was going to be fired." (Doc. 32-2 at 231:3–6). Mr. Perry testified that he never told his customers, or told Mr. Hooten that he told his customers, that he needed them to make an order or he would lose his job. Additionally, on the day Mr. Perry was fired, Hagemeyer's reply to his contention that he had been making his sales numbers was that he "couldn't continue to count on [his] friends to give [him] business." (Doc. 27-2 at 96:15–16).

Mr. Perry alleges that he did not receive any feedback regarding his compliance with any of the PIP requirements. Mr. Hooten testified that when he received Mr. Perry's business plan, he told him that he was "disappointed in what he had come back with." (Doc. 32-2 at 8–9). Mr. Hooten also testified that he "would have" verbally indicated to Mr. Perry that his call report was timely but did not satisfy the requisite number of calls per day. (Doc. 32-2 at 289:24).

According to Hagemeyer, by April 1, 2013, Mr. Hooten determined that Mr. Perry was making insufficient progress toward the PIP requirements to improve his sales performance and had not complied with the third and fourth PIP requirements; accordingly, he recommended that Mr. Perry be terminated. Hagemeyer terminated Mr. Perry's employment on April 1, 2013. Mr. Perry disputes these reasons for his discharge and argues that his termination was motivated by discriminatory animus based on his age.

E.      Other Hagemeyer Account Representatives

Hagemeyer assigned each of its account representatives to their own geographic territories with "loose boundary line[s]" and assigned accounts to geographic territories and corresponding sales representatives. (Doc. 32-2 at 49:6–7).

In 2010, Hagemeyer terminated Tom White, who in 2009 was the sole Hagemeyer account representative based in Decatur, Alabama; at the time of his termination, he was the

11

oldest account representative Mr. Hooten supervised, although the record does not reflect Mr.

White's age. In January 2010, Hagemeyer hired Tab Bowling, who was born in 1959 and was

younger than Mr. White, to be an account representative based in Decatur. Hagemeyer

transferred some of Mr. White's business to Mr. Bowling before terminating Mr. White. Mr.

Hooten testified that Mr. White was let go because Hagemeyer eliminated one of its outside sales

positions. Mr. White's account base was larger than Mr. Bowling's at the time he was fired, and

one criterion in his termination decision was "account base and the dollars that [he was]

generating." (Doc. 32-2 at 85:19–20). However, in deciding which representative to terminate,

officers were "looking more at attitude, work ethic, energy, aggressiveness, somebody with a

positive morale and positive energy around them." (*Id.* at 85:22–25).

 Mr. Hooten noted of Mr. White: "His territory was just not growing; it had been stagnant

for some time. . . . [His sales] were stagnant or declining." (Doc. 32-2 at 78–79). Prior to Mr.

White's discharge, Mr. Hooten had placed Mr. White on a performance improvement plan. Mr.

White's termination letter informed him that "[his] position with Hagemeyer NA is being

eliminated" and offered him severance in exchange for a release of claims against it, including

those under the ADEA. (Doc. 32-2 at 22–24). Most of Mr. White's accounts were assigned to

Mr. Bowling after Mr. White was terminated. According to Hagemeyer's March 2013 year-to-

date figures, most of Mr. Bowling's year-to-date sales at that time came either from accounts he

inherited or from national accounts Mr. Hooten assigned to him.

 In Mr. Perry's 2012 performance evaluation, Mr. Hooten criticized Mr. Perry for "asking

me to give him a piece of business that is already developed by someone else or is a large

national account customer. . . . I don't think he has the drive or desire to put in the necessary

work." (Doc. 27-1 at 23). Mr. Hooten did not similarly criticize Mr. Bowling for not "getting out there and developing his own business." (Doc. 32-2 at 173:7–8).

At the time Hagemeyer terminated Mr. Perry, Mr. Hooten supervised four other account representatives who were ages 39, 49, 52, and 54. Five months after Mr. Perry's termination, Hagemeyer hired a 29-year-old individual to replace him.

F.      Allegedly Age-Related Comments

Mr. Perry avers that, prior to January 11, 2013, Mr. Hooten had commented several times in conversations with Mr. Perry that it was his "dream" or "hope" that Mr. Perry would "walk in the door one day" and tell Mr. Hooten that he intended to retire, and that Mr. Hooten had "three to six months" to find someone to take over Mr. Perry's business. (Doc. 32-1 at 15 ¶ 63).

Mr. Hooten affirmed that during several different conversations, he had expressed his "hope" and "dream" that Mr. Perry would retire in a certain way:

> I considered myself a friend of Randy's, not only his manager. I wanted him to determine when he was done working. And my ideal scenario was that once he thought he no longer wanted to work or needed to work, he would come to me and say, Jay, I think this will be my last year. I am going to give you "X" number of months to go find a good replacement for me and give me time to go and introduce that person to my customers, get my customer feeling comfortable with them, and then I'm done.

(Doc. 32-2 at 91:5–16). Mr. Hooten testified that he recognized a company can more easily retain business "when you have some continuity, if the older sales rep introduces the younger sales rep to the accounts so they know who the new guy is[.]" (Doc. 32-2 at 310:19–23). Mr. Perry never expressed any intent or desire to retire to Mr. Hooten.

Mr. Hooten and another Hagemeyer officer made comments to Mr. Perry referencing the

"long, many years that [he] had in with the company" and told him "that it should not be any problem to gain more business" because of his years of experience. (Doc. 27-2 at 57:22–58:8). Mr. Hooten felt that the company could hold Mr. Perry to a higher standard because he had worked for the company for 30 years.

Around the time that Hagemeyer terminated Mr. White, Mr. Hooten told Mr. Perry that Mr. White "was old and set in his ways and . . . he wasn't going to change." (Doc. 27-2 at 59:2–3).

G.      Filing of EEOC Charges

The signature date on Mr. Perry's "Charge of Discrimination" and EEOC Intake Questionnaire is September 27, 2013. The "received" date stamp on the "Charge of Discrimination" form, however, is September 29, 2013; 180 days after April 1, 2013 is September 28, 2013.

## III.    Analysis

The federal ADEA and the Alabama ADEA make it unlawful for an employer to discharge or otherwise discriminate against an individual who is 40 or older because of age. 29 U.S.C. §§ 623(a)(1), 631(a); ALA. CODE § 25-1-21. To recover under either ADEA, an employee must take appropriate action within 180 days of the allegedly unlawful event. 29 U.S.C. §§ 623(d)(1)(A) (mandating that an employee desiring to bring suit under the federal ADEA file a charge with the EEOC within 180 days after the alleged unlawful event occurred); *Byrd v. Dillards, Inc.*, 892 So.2d 342, 346 (Ala. 2004) (holding that the Alabama ADEA requires an employee to either file suit in state court or file a charge with the EEOC within 180 days from the occurrence of the alleged unlawful practice).

14

The same standards govern claims under the federal ADEA and the Alabama ADEA. *See Dooley v. AutoNation USA Corp.*, 218 F. Supp. 2d 1270, 1277 (N.D. Ala. 2002) (internal citation omitted); *Robinson v. Alabama Central Credit Union*, 964 So. 2d 1225, 1228 (2007). The employee may establish a claim of illegal age discrimination through either direct or circumstantial evidence. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). In the federal (and therefore also the Alabama) ADEA context, the employee must show "that age was the but-for cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (internal quotation marks omitted).

Mr. Perry alleges in his Complaint that Hagemeyer discriminated against him on the basis of his age by reassigning his accounts to a younger, less qualified employee and then terminating him. (Doc. 1 at 3–5). Mr. Perry argues in his Opposition to the Motion for Summary Judgment that he suffered the additional age-based adverse employment actions of (1) the decision to take the U.S. Steel account away from him and (2) being evaluated under a "higher" and less favorable standard than younger employees; these claims are not pled in his Complaint and so the court does not address them as actionable claims. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."). However, the facts surrounding these actions may be considered as evidence of discriminatory animus based on age.

Moreover, the "younger, less qualified employee" to whom his accounts allegedly were reassigned who is referenced in the Complaint, "Chad Smith," makes no appearance in Plaintiff's response to the summary judgment motion. And in any case, because the parties do not dispute

15

that Mr. Perry's account base did not decrease from 2010 through 2012, any claim of account reassignment would date to 2009 at the latest and would be time-barred because Mr. Perry did not file his EEOC charge until September 2013. *See* 29 U.S.C. §§ 623(d)(1)(A); *Byrd*, 892 So. 2d at 346. However, "a plaintiff can use evidence of time-barred discriminatory conduct to meet his burden of persuasion in a case involving circumstantial evidence of discrimination." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1436 (11th Cir. 1998) (reviewing cases). The sole claim before the court, then, is Mr. Perry's assertion that he was fired because of his age.

### A.     Timeliness of EEOC Charge

Mr. Perry contends that the signature date on his EEOC documents, September 27, 2013, rather than the "received" date, reflects the actual filing date of his EEOC charge. Hagemeyer disagrees and contends that the filing date is the "received" date, September 29, 2013, which would make the charge untimely. The record does not reveal the EEOC's intake procedures or whether Mr. Perry submitted his documents in person or via some other method. Taking the facts in the light most favorable to the Plaintiff, the court finds that a reasonable jury could find that Mr. Perry timely submitted his EEOC charge on September 27, 2013.

### B.     Direct Evidence of Discrimination

"'[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002)). Mr. Perry contends that Mr. Hooten's comments to him about his "dream" or "hope" that Mr. Perry would tell him he intended to retire constitute direct evidence that Mr. Perry's termination was based on his age.

Mr. Perry's version of these comments, on its face, does not show that they are related to his age at all.

Even taken in the light most favorable to Plaintiff, these comments at best show that Mr. Hooten wanted to know when Mr. Perry would retire. *See, e.g.*, *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (stating that "a company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct"). And Mr. Hooten's explanation of these comments establishes that they were not discriminatory, but rather reflected a reasonable desire that Mr. Perry retire in a manner that would permit Hagemeyer to maintain seamless business relationships with its customers.

Mr. Hooten and another Hagemeyer officer made comments to Mr. Perry referencing the "long, many years that [he] had in with the company" and told him "that it should not be any problem to gain more business" because of his years of experience. (Doc. 27-2 at 57:22–58:8). And Mr. Hooten felt that the company could hold Mr. Perry to a higher standard because he had worked for the company for 30 years. Like the "dream" or "hope" remarks, these comments do not refer to Mr. Perry's age but to his level of experience.

Accordingly, Mr. Perry has presented no direct evidence of discrimination.

### C.    *McDonnell Douglas* Analysis

A plaintiff relying on circumstantial evidence normally proves discrimination under the ADEA using the *McDonnell Douglas* burden-shifting framework. *See Sims*, 704 F.3d at 1332-33 (discussing the application of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) after the decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)).

17

Under the *McDonnell Douglas* framework, the plaintiff must first show a prima facie case of discrimination and the burden then shifts to the defendant to show a legitimate, nondiscriminatory reason for its action. *Chapman v. Al Trans.*, 229 F.3d 1012, 1024 (11th Cir. 2000). The plaintiff must then show that the defendant's proffered reason is pretext. *See id.*

        1.    <u>Prima Facie Case</u>

To establish his prima facie case, Mr. Perry must show that he (1) was a member of the protected class; (2) was qualified for his position; (3) was subjected to adverse employment action; and (4) was replaced by a substantially younger person. *See Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).

Hagemeyer does not contest Mr. Perry's ability to establish a prima facie case of discrimination, and the court finds that he has established one. Mr. Perry is a member of the ADEAs' protected class because he was 56 at the time he was terminated. He qualified for the position of account representative, as demonstrated by the praise and recognition he received for his job performance, exemplified in his 2008 performance evaluation; his sales awards; his several years of being the leading Hagemeyer account representative in Alabama; his sterling disciplinary record; and his tenure in the position. *See Lieberman v. Metropolitan Life Ins. Co.*, 808 F.3d 1294, 1299 (11th Cir. 2015) (holding that—in a case where the plaintiff was discharged after negative performance evaluations and being placed on a performance plan, and had a history of leadership awards and leadership of a high-performing branch—"[n]ine years in the same position, and nearly three decades at the company, is long enough to support the inference that he was qualified for his job").

Mr. Perry was subject to an adverse employment action when he was fired, and he was

18

replaced by someone substantially younger (a 29-year-old). Because Mr. Perry has established a

prima facie case of age discrimination, the burden shifts to Hagemeyer to show a legitimate, non-

discriminatory reason for its decision to terminate Mr. Perry.

 2.  Non-Discriminatory Reasons for Termination

Hagemeyer has proffered two legitimate, non-discriminatory reasons for its decision to

discharge Mr. Perry: his declining sales performance over three years and his failure to fulfill the

requirements of the PIP. Because Hagemeyer has articulated non-discriminatory reasons for its

termination decision, the burden shifts back to Mr. Perry to show that Hagemeyer's given reasons

were a pretext for discrimination.

 3.  Pretext

"A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or

substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030. Rather,

"[p]rovided that the proffered reason is one that might motivate a reasonable employer, an

employee must **meet that reason head on and rebut it**, and the employee cannot succeed by

simply quarreling with the wisdom of that reason." *Id.* (internal citations omitted) (emphasis

added). Three years of declining sales performance and a failure to comply with the components

of the PIP, which Mr. Perry was required to meet as a result of his failure to generate new

business and improve his sales performance, could motivate a reasonable employer to terminate a

sales representative.

"If the plaintiff does not proffer sufficient evidence to create a genuine issue of material

fact regarding whether **each** of the defendant employer's articulated reasons is pretextual, the

employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1025

(internal citation omitted) (emphasis added).

a.     *Sales Performance*

Mr. Perry does not contest that his sales, as measured by his yearly gross margin, declined from 2009 through 2012; that no accounts other than the U.S. Steel account were taken from him during that period; or that during that time, he failed to replace the U.S. Steel business and other decreasing revenue accounts with new customers. Rather, he presents his sales data in the form of *quarterly* numbers, arguing that none of his quarterly gross margin numbers from 2010 through 2013 were as low as his gross margin numbers for the last two quarters of 2009.

Mr. Perry's quarterly sales numbers show a distinction without a difference. His sales still declined from 2009 through 2012. Even if Mr. Perry's quarterly numbers are a more accurate assessment of his abilities, "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by" his age. *Wilson*, 376 F.3d at 1092 (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)). Mr. Perry has not done so.

b.     *Compliance with the Performance Improvement Plan*

Mr. Perry does not dispute that he did not comply with all four specific requirements of the PIP, despite Mr. Hooten's warning him on January 11, 2013 that "if you want to work here you're going to follow the guidelines of this PIP, and if you miss any one of them, we're not going to have another conversation." (Doc. 27-2 at 43) (emphasis added).

A genuine dispute of fact exists as to whether Mr. Perry submitted a business plan that complied with the first PIP requirement by including 20 customers rather than 19. However, Mr. Perry does not dispute that his weekly call reports did not reflect a plan to call at least five

20

customers every day, nor that he did not take four different supplier representatives on calls with him each month. He claims that he attempted to set up sales calls with Ken Coats, but does not argue that he did make any sales calls with Mr. Coats, or that he informed Mr. Hooten that he had difficulty scheduling calls with supplier representatives and/or Mr. Coats. Finally, Mr. Perry failed to enter cost savings proposals into the VPP database or provide the proposals to Mr. Hooten in any other format.

Mr. Perry presented evidence that he took steps toward or tried to comply with the PIP requirements. He also shows that Mr. Hooten did not document any inadequacy concerning Mr. Perry's business plan or call log. Mr. Perry alleged that he did not receive any feedback regarding his compliance with any of the PIP requirements; Mr. Hooten testified to the contrary.

Both Mr. Perry's steps toward compliance and the dispute over feedback are immaterial, however, because Hagemeyer's standard inquired not whether Mr. Perry made some efforts toward complying with the performance improvement plan or whether he complied with it upon receiving appropriate feedback, but whether he did in fact comply with <u>all</u> of its requirements. "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).

Mr. Perry also proffers his March 2013 year-to-date gross margin numbers to show that he was on track to meet the sales performance measure of the PIP, considered by Mr. Hooten to

be its "most important" element, during the period between January 11 and April 1, 2013. (Doc. 32-2 at 303:18). But Mr. Perry's sales during the first quarter of 2013 do not establish that his total 2013 sales would have met the PIP goal of a yearly $500,000 gross margin, and the PIP required "improved and sustained performance, in addition to meeting specific sales goals . . . ." (Doc. 27-1 at 27).

Further, Mr. Perry and Mr. Hooten dispute whether Mr. Perry told Mr. Hooten that he was obtaining his 2013 sales by communicating to customers that he would be fired if they did not place orders. Accepting Mr. Perry's testimony that he did not so inform Mr. Hooten, along with Mr. Hooten's statement that "[t]he manner in which [Mr. Perry] was generating those sales" was "one of the reasons" Hagemeyer fired him, does not show that Mr. Perry's failure to comply with all of the specific PIP requirements was a pretextual reason for his firing or that Hagemeyer would not have terminated him but for his age.

Mr. Perry has failed to meet his burden to show that Hagemeyer's second stated reason for terminating him, that he failed to meet each of the requirements of the PIP, was pretextual.

### D.    Mosaic of Circumstantial Evidence

Alternately, rather than relying upon the *McDonnell Douglas* framework, a plaintiff may present a "convincing mosaic" of circumstantial evidence permitting an inference of intentional discrimination. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)).

Mr. Perry's additional charges that Hagemeyer discriminated against him based on his age—by (1) evaluating him under a higher and less favorable standard than younger employees; (2) reassigning his accounts to a younger, less qualified employee; and (3) taking the U.S. Steel

22

account away from him—are time-barred or not pled in his Complaint. However, because Mr. Perry presented evidence in support of each of these allegations, the court will consider whether they present a mosaic of evidence that would support an inference that age was the but-for cause of Mr. Perry's termination.

First, Mr. Perry argues that Hagemeyer held a younger account representative, Tab Bowling, to a different, lower standard regarding account development. Mr. Bowling was three years younger than Mr. Perry; the court assumes without deciding that here, the three-year age difference made Mr. Bowling "substantially younger." *See Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (finding a three-year age difference sufficient to establish a prima facie case of age discrimination); *Suarez v. Sch. Bd. of Hillsborough Cnty.*, 638 F. App'x 897, 901 n.1 (11th Cir. 2016) (citing *Carter* and stating that the Eleventh Circuit has found small age differences sufficient for purposes of establishing a prima facie case "where plaintiffs presented substantial evidence of discriminatory animus beyond mere age difference").

The record does not support a finding that Mr. Perry was held to a different or lower standard than Mr. Perry. The evidence shows that as of March 2013, many of Mr. Bowling's most profitable accounts were those he had inherited from a discharged employee, Tom White, or national accounts assigned to him. While Mr. Hooten criticized Mr. Perry for "asking me to give him a piece of business that is already developed by someone else or is a large national account customer" and stated, "I don't think [Mr. Perry] has the drive or desire to put in the necessary work," Mr. Hooten did not similarly criticize Mr. Bowling, despite Mr. Bowling having not personally developed his most profitable accounts. (Doc. 27-1 at 23). And Mr. Hooten maintained that the company could hold Mr. Perry to a higher standard because of his 30 years of

work experience with the company.

Mr. Bowling and Mr. Perry were not sufficiently similarly situated to show that Hagemeyer treated Mr. Bowling from Mr. Perry regarding account development. *See Connor v. Bell Microproducts-Future Tech, Inc.*, 492 F. App'x 963, 965 (11th Cir. 2012) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("In order to make a valid comparison, the plaintiff must show that he and the comparators are similarly situated in all relevant respects.") For one thing, the two representatives were based at different branches and covered different territories; variations in account assignment would necessarily exist between territories.

More importantly, the two representatives differed vastly in their levels of tenure and experience at the company. An employer may hold more experienced employees to a higher standard of performance. *See, e.g.*, *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 745 (10th Cir. 1991) (holding that evaluation of plaintiff, who held a high-level position, under a higher standard than "younger, less experienced" employees did not, without more, show age discrimination); *Collins v. Okefenoke Rural Elec. Membership Corp.*, 2014 WL 7440887 at *11 (S.D. Ga. Dec. 29, 2014) (stating that the Eleventh Circuit has made clear that courts may consider experience in determining whether comparators are similarly situated and declining to "second guess" employer's decision to hold employees with "vastly more experience" to a higher standard in evaluating misconduct).

Second, the record simply does not show that Mr. Perry's accounts were reassigned to younger, less qualified employees. The evidence on this point shows that prior to the designation of the U.S. Steel account as a house account, *Mr. Perry gave* a number of his accounts to other account executives upon the request of Mr. Hooten. Mr. Perry affirmed in 2010 that he *gave*

accounts to junior sales representatives, but the record does not reveal whether "junior" means younger or merely less senior. Mr. Perry's vague assertion in 2011 that accounts were taken from him does not provide sufficient detail to show that age played any role in such action.

Third, though a genuine dispute exists as to the reasons motivating Hagemeyer's 2009 designation of the U.S. Steel account as a house account, none of those reasons was Mr. Perry's age. Nor are the reasons necessarily inconsistent with each other. Regarding his loss of the U.S. Steel account, Mr. Perry may have raised an inference that he was treated unfairly, but unfairness is a far cry from intentional discrimination based on his age. The reduction of Mr. Perry's salary after the designation of the U.S. Steel account as a house account similarly does not show that the account was taken from Mr. Perry because of his age, or that he was terminated because of his age.

Mr. Perry additionally seems to argue that Hagemeyer's treatment and termination of Mr. White raise an inference that Hagemeyer's proffered reasons for discharging Mr. White were pretextual to show that Hagemeyer's proffered reasons for terminating Mr. Perry were pretextual. The record regarding Mr. White's discharge is insufficiently developed for the court to conclude that Mr. White's firing was discriminatory based on his age. In other words, this inferential chain lacks any hook providing an initial inference of age discrimination.

Mr. Hooten's comment to Mr. Perry that Mr. White "was old and set in his ways and . . . wasn't going to change," without any kind of context, certainly does not establish that Hagemeyer terminated Mr. White because of his age and not because of his "stagnant or declining" sales. (Doc. 32-2 at 78–79). Nor do Hagemeyer's stated criteria for assessing which account representative to discharge—"attitude, work ethic, energy, aggressiveness, somebody

with a positive morale and positive energy around them"—establish pretext. *See Stone v. First Union Corp.*, 203 F.R.D. 532, 549 (S.D. Fla. 2001) (holding that a company's statements that it sought "young bankers" with "fresh new ideas and outlook" to be the company's "energetic" future" did not show that "age discrimination was the standing operating procedure"; neither did the company's use of the terms "aggressive" and "extremely high energy level" to describe exceptional employees, as "these terms are not uniquely used to describe young people"). An employer's choice to make a termination decision based in part on subjective criteria does not, without more, indicate pretext. (Doc. 32-2 at 85:23–25); *see Chapman*, 229 F.3d at 1034 ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.").

Mr. Perry also seems to argue that Mr. Hooten's disregard of the time Mr. Perry spent restocking the vending machines for Alabama Power, which prevented him from developing other business, raises an inference of age discrimination. However, as with every other piece of evidence Mr. Perry has presented, insensitivity or unfair treatment combined with Mr. Perry's status as the oldest or one of the older account representatives under Mr. Hooten's supervision does not show discrimination based on age.

Finally, the statements the court previously examined as possible direct evidence of discrimination, Mr. Hooten's statements about Mr. Perry's retirement and the officers' comments about Mr. Hooten's experience, do not constitute circumstantial evidence of age discrimination for the same reasons they do not show direct discrimination.

**IV.     Conclusion**

Mr. Perry has not raised a genuine issue of material fact that age was the "but-for" cause of Hagemeyer's decision to fire him and hire a younger employee to replace him, nor that age was even a factor in Hagemeyer's decision. Accordingly, the court **GRANTS** Defendant's Motion for Summary Judgment. The court will enter a separate order consistent with this opinion.

**DONE** this 31st day of March, 2017.

*Karon O. Bowdre*

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE